**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**MICHAEL SUEVSKY,**

      **Plaintiff,**

**v.**　　　　　　　　　　　　　　　　　　　　　　　Case No:　6:15-cv-342-Orl-31KRS

**WALT DISNEY WORLD PARKS AND**
**RESORTS ONLINE, INC.,**

      **Defendant.**

## ORDER

This matter comes before the Court without oral argument upon consideration of Defendant Walt Disney World Parks and Resorts Online, Inc.'s ("Defendant") Motion for Summary Judgment (Doc. 49); Plaintiff Michael Suevsky's ("Plaintiff") response in opposition (Doc. 63); and Defendant's reply (Doc. 65).

**I. Overview**

In his Complaint, Plaintiff alleges that his former employer discriminated against him because of his race, ancestry, ethnicity, religion, and national origin in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. (Doc. 25 at 1).   Specifically, Plaintiff alleges that Defendant subjected him to a hostile work environment, constructive discharge, failure to promote, and disparate treatment. (*Id.*).   After filing a complaint with the Equal Employment Opportunity Commission and obtaining a right to sue letter, Plaintiff brought this suit against Defendant.   Defendant has now moved for summary judgment on all claims asserted in the Complaint. (Doc. 49 at 1-2).

**II. Factual Background**

**A. General**

Defendant is an entertainment conglomerate headquartered in Burbank, California. Plaintiff is a Russian American who practices the Jewish faith. (Doc. 25 at 2).   The following facts in this section are undisputed.   Plaintiff was employed by Defendant from January 2011 to January 2013. (Doc. 49 at 2, 9).   He was hired as a Staff Quality Assurance ("QA") Engineer, working out of Defendant's Seattle, Washington office. (Doc. 49 at 2).   The team on which Plaintiff worked was responsible for testing and assuring the quality of a myriad of software products before they were implemented into regular use by the company. (*Id.* at 3; Doc. 56 at 1). Plaintiff's team collaborated extensively with other groups within the company. (Doc. 57 at 2). As such, Jeff Hall, the supervisor of the unit, testified that members of the team were expected to maintain professional, cooperative, and collaborative relationships with their colleagues. (*Id.*).

For a short time, Plaintiff worked directly for Hall, a Director of Technology for Defendant. (Doc. 49 at 2).   Around January 2011, Hall was moved to a different position and replaced by Philip Hopbell, who was given the title Director of QA. (*Id.* at 2; Doc. 55 at 1-2; Doc. 57 at 5).   Hopbell oversaw the QA operations in Glendale, California; Orlando, Florida; and Seattle, Washington. (Doc. 55 at 1-2).   In October 2011, Kevin Scherrer was hired as the QA manager at the Seattle location.[1]   (Doc. 49 at 3; Doc. 55 at 1; Doc. 57 at 4).   By the time the transfers and hiring were finished, Plaintiff reported directly to Scherrer, and Scherrer reported to Hopbell. (Doc. 49 at 3).

---

[1] Plaintiff also applied for the QA manager position at the Seattle location. (Doc. 57 at 2-3).

### B. Nature of the Harassment

Plaintiff claims that he was subject to hostile and unwanted treatment from both Brent Wood, a Seattle QA manager who never supervised Plaintiff, and Hopbell, (Doc. 63 at 2), and that this alleged harassment was due to his race, national origin, and religion. Specifically, Plaintiff stated Wood commented that the redness of Plaintiff's face was likely due to alcohol consumption and that it is common knowledge that people of Russian descent consume copious amounts of alcohol.[2] (Doc. 25 at 3; Doc. 50 at 49; Doc. 63 at 2). Plaintiff further contends that Wood continued to make stereotypical comments, including statements about Russians, alcohol, and Jews. (Doc. 63 at 2). However, Plaintiff can point to no specific examples of these statements. (Doc. 50 at 56-57). In his deposition, Plaintiff also references Wood making culturally insensitive comments about other coworkers, but likewise fails to provide specific evidence of these comments. (*Id.*; Doc. 63 at 2). Plaintiff testified that these comments on the whole made him feel uncomfortable, (Doc. 50 at 56; Doc. 63 at 2), and he eventually stopped attending meetings Wood ran. (Doc. 49 at 11).

Plaintiff further alleges that Hopbell subjected him to a hostile work environment. Plaintiff testified in deposition that Hopbell made a comment to Scherrer that he wanted to "manage out" the Plaintiff.[3] (Doc. 50 at 86; Doc. 51 at 63). Specifically, Plaintiff claims that Hopbell disagreed with him more than other QA engineers, (Doc. 51 at 14), gave him smaller, simpler responsibilities than other engineers, (Doc. 51 at 63), and gave him an expectations memo

---

[2] Plaintiff testified that Wood made this comment on Wood's first day of work as he was introducing himself to the office. (Doc. 50 at 54).

[3] Presumably, the term "manage out" is used by the Plaintiff to refer to the treatment he endured, which was intended to make him seek alternate employment.

- 3 -

requiring Plaintiff to take communications classes.[4] (Doc. 63 at 4). Also, Plaintiff contends that Hopbell humiliated him during a telephone conference with more than ten other individuals present. (Doc. 25 at 3). It is undisputed that Hopbell told Plaintiff to be quiet and stop talking during the conference call.[5] (Doc. 49 at 5; Doc. 50 at 80). Plaintiff testified that he believed Hopbell disliked him, but he could not provide an example of Hopbell using his Russian descent or Jewish faith as a basis for that dislike.[6]

Defendant asserts that neither Wood nor Hopbell subjected Plaintiff to a hostile work environment. Specifically, Defendant argues that Wood was never Plaintiff's boss and, after 2011 when Plaintiff stopped attending his meetings, Wood had minimal contact with Plaintiff.[7] (Doc. 49 at 11; Doc. 50 at 59). Additionally, Defendant claims that Plaintiff can point to only one comment made by Wood regarding Plaintiff's national origin. (*Id. See* Doc. 50 at 48-49). Moreover, Defendant points out that Plaintiff testified in deposition that at the time the comment was made, he believed it to be a "harmless joke."[8] (Doc. 50 at 49).

---

[4] It is undisputed that Defendant gave Plaintiff the expectations memo. (Doc. 49 at 10; Doc. 63 at 4). The expectations memo will be discussed in detail later.

[5] Plaintiff relayed information regarding this argument to Jennifer Chikato (Human Resources Representative) around April 30, 2012. This information was relayed by Chikato to Richard Webby (Hopbell's supervisor) who discussed the issue with Hopbell. Chikato felt this matter was resolved, especially since Hopbell sent an email conveying his apologies to the Plaintiff. (Doc. 58 at 2).

[6] Plaintiff also claims Hopbell disliked others on the team because of their Indian or Latino descent. (Doc. 63 at 3). However, Plaintiff provides no evidence to support this claim.

[7] Plaintiff stated in deposition that he avoided Wood after he stopped attending the meetings. (Doc. 50 at 59).

[8] Plaintiff now contends that while he thought the remark was a "harmless joke" at the time, there was an "underlying perception . . . that later materialized" into the inappropriate behavior claimed herein. (Doc. 50 at 49).

- 4 -

As for Hopbell, Defendant argues that Plaintiff can point to no specific evidence that any of Hopbell's actions were in any way related to Plaintiff's national origin, religion, or ancestry. (Doc. 49 at 10).   Defendant further argues that, as Plaintiff stated in deposition, the only reason Plaintiff believed the perceived negative treatment was based on his national origin and religion is because there was no other reason for it. (*Id.* at 10-11; Doc. 50 at 71).

Finally, it is undisputed that Plaintiff was aware that company policy required discrimination and harassment complaints be directed to the Human Resources Department.[9] (Doc. 50 at 39-40).    Further, Plaintiff did not complain to HR about negative treatment in the workplace based on his ancestry or religion. (Doc. 51 at 10, 35, 42).

## C.  Plaintiff's Work Performance and Resignation

According to Scherrer (Plaintiff's direct supervisor), during his time with the company Plaintiff was well respected for his technical acumen. (Doc. 56 at 3).   However, according to Scherrer and Hopbell (Scherrer's boss), at times Plaintiff's hard line stances regarding the best solutions to problems translated into an unwillingness to work with others and compromise. (*Id.*; Doc. 55 at 4).

In October 2011, Hall (Plaintiff's first supervisor) conducted Plaintiff's first performance review. (Doc. 57 at 4-5).   Plaintiff received a "right on track" rating, but Hall noted in the evaluation that Plaintiff needed to improve his communication skills with others.[10] (*Id.* at 11). Further, Hall informed Plaintiff that his role might be changing in the coming months as the QA

---

[9] Plaintiff testified in deposition that he knew the company had a policy and he knew that any allegations of discrimination were to be discussed with the Human Resources Department. (Doc. 50 at 39-40).

[10] The evaluation ranges and classifications are as follows (from worst to best): Off-Track, Falling Behind, Right on Track, Moving Ahead, Leading the Way. (Doc. 57 at 28).

- 5 -

team continued to grow and that Plaintiff should familiarize himself with the new expectations for his position. (*Id.*; Doc. 49 at 3).   Plaintiff disputes none of these statements.

Just before Plaintiff received his first review, Hall spoke with Plaintiff about whether he should interview for the newly created Seattle-based QA manager position.[11]  (Doc. 57 at 2). Even though Hall had some concerns regarding Plaintiff's past behavior (as detailed in Hall's affidavit), he encouraged Plaintiff to apply and stated that going through the interview process would be good for Plaintiff. (*Id.* at 2-3).   When Plaintiff received his interview schedule, Plaintiff contacted Hall regarding his concern that Wood was on one of the interview panels.[12]  (Doc. 57 at 7-8).   Hall assured Plaintiff that everything would be fine and framed this as an opportunity for Plaintiff to overcome his past issues with Wood. (*Id.*). After the interviews, Plaintiff stated in deposition that he could not recall any problems with Wood or the other two interviewers (Les Honnibel and Brett Bender).[13]  (Doc. 51 at 104; Doc. 52 at 86).

Ultimately, after reviewing written reports from Honnibel and Bender, Hall decided not to hire Plaintiff for the position. (Doc. 57 3-4).   Both Honnibel and Bender conveyed to Hall that Plaintiff had the technical ability to do the job, however they noted problems with his people skills. (*Id.*).   Hall decided to hire Scherrer because he believed the position to primarily be about managing people and not technical skills.[14]  (*Id.* at 4).

---

[11] Hall was the manager who ultimately decided who to hire for the position. (Doc. 57 at 2).

[12] Plaintiff was concerned about Wood being on the panel because of their past interactions. (Doc. 57 at 8).

[13] Les Honnibel is the QA manager for the Glendale, California office. Brett Bender is the Technology Manager for the Orlando, Florida office. (Doc. 57 at 3).

[14] While Plaintiff felt his technical skills were better, he did admit in deposition that Scherrer was a good manager. (Doc. 51 at 107).

In February 2012, Jennifer Chikato, a Human Resources Business Partner ("HR Partner"), began to work with Plaintiff in connection with his areas marked for improvement on the prior year's evaluation. (Doc. 49 at 5; Doc. 58 at 2). Part of this help included Chikato offering to assist Plaintiff in improving his communication style. (Doc. 58 at 2). Despite this help, Scherrer stated in his affidavit that Plaintiff's issues with communication and working with others persisted throughout 2012. (Doc. 49 at 5; Doc. 56 at 4-5). Plaintiff admits in his deposition that he continued to have differences of opinion with his colleagues throughout 2012. (Doc. 51 at 20).

Due to Plaintiff's continued communication struggles throughout 2012, Hopbell became concerned that the QA team may not be the right place for Plaintiff. (Doc. 55 at 4). Hopbell told Plaintiff that if he didn't feel that the QA team provided him the best opportunity to succeed, he could seek another position within the company.[15] (*Id.*). By the fall of 2012, both Scherrer and Hopbell decided to take additional steps to help Plaintiff succeed. (Doc. 49 at 6). To that end, Hopbell, in conjunction with Scherrer and Chikato, decided to issue Plaintiff an expectations memorandum.[16] (Doc. 49 at 6; Doc. 55 at 4). Hopbell stated in his affidavit that he issued these memos to all managers who worked for him. (Doc. 55 at 4). Plaintiff's memo was issued in September 2012, it was signed by his direct supervisor (Scherrer), and it detailed the job description for his position. (*Id.* at 8-9). Further, the memo concluded with a statement of support for the Plaintiff. (*Id.* at 9; *see also* Doc. 49 at 6). In addition to the memo, Plaintiff stated in

---

[15] Conversely, Plaintiff characterizes this conversation as Hopbell telling him he wasn't the right fit and that he should start seeking employment elsewhere in the company. (Doc. 51 at 8).

[16] An expectations memorandum is provided to employees to help them fully understand the responsibilities of their roles. It identifies key areas where an employee should focus their attention in order to be successful. It is based off the job description for the position. It is not a form of discipline. (Doc. 55 at 4; Doc. 58 at 3).

deposition that he was required to take communications classes to help bolster his communication skills. (Doc. 51 at 21; Doc. 63 at 4).

Around the same time as the expectations memo was issued, Plaintiff received his performance evaluation for the 2011-2012 year. (Doc. 55 at 4).  The review was drafted by Scherrer with input from other managers with whom Plaintiff had worked. (Doc. 49 at 7; Doc. 55 at 4).  Plaintiff's review shows that he was given a "Falling Behind" rating (the 4th out of 5 ratings on the aforementioned performance evaluation scale). (Doc. 49 at 7; Doc. 56 at 24). The review was based on the ongoing communication and collaboration problems with Plaintiff and the fact that Plaintiff had failed to achieve some tasks that were included in his yearly objectives. (Doc. 49 at 7; Doc 56 at 19-24). Plaintiff believed this rating was unfair, (Doc. 51 at 57; Doc. 63 at 4), because he was criticized for behavior for which others were praised and he was evaluated on criteria that were not included in his objectives. (Doc. 51 at 52, 57). As such, Plaintiff stated that he decided to appeal his rating. (Doc. 51 at 33; Doc. 58 at 11).

According to Plaintiff, Defendant never followed up with him to interview him regarding his appeal.[17] (Doc. 63 at 4). However, in early October Hopbell, Richard Webby (Vice President of Engineering and Hopbell's boss), Jarret Smith (Vice President of Production Operations and Webby's boss), and Chikato met and concluded the rating was justified.[18] (Doc. 49 at 8; Doc. 55 at 5).  Chikato communicated the decision to the Plaintiff, who asked to speak with Chikato's supervisor. (Doc. 49 at 8; Doc. 58 at 4).  In response to this inquiry, Plaintiff had a one on one

---

[17] Plaintiff admits in his deposition that he had no knowledge of how the appeals process worked or if interviews were a part of that process. (Doc. 51 at 37).  Chikato states in her affidavit that employees are "not a part of the review process." (Doc. 58 at 4).

[18] Chikato also stated that she had reviewed the evaluation before it was administered and determined, based on the information received and her personal experiences with the Plaintiff, that it was justified. (Doc. 58 at 3).

meeting with Webby to discuss, *inter alia*, the evaluation. (Doc. 49 at 8; Doc. 51 at 15; Doc. 58 at 4). In addition, Chikato stated she provided the name of her supervisor to Plaintiff. (Doc. 58 at 4). After the meeting with Webby, Plaintiff expressed, via email, his gratitude to Webby for meeting with him and Webby thanked Plaintiff for his commitment to the company. (Doc. 60-1 at 42-43).

After the appeal and discussion with Webby, around November 30, 2012, Plaintiff reached out to Chikato for a status update on his inquiry from April 30, 2012.[19] (Doc. 49 at 8; Doc. 58 at 4). Although Chikato tried to schedule a meeting regarding this matter, Plaintiff expressed further frustration with her and asked again to be directed to her supervisor. (Doc. 49 at 8; Doc. 58 at 4-5). Due to Plaintiff's concerns, Chikato's supervisor, Wende Bendik, arranged a follow up with Plaintiff.[20] (Doc. 58 at 5). Around the same time, Plaintiff asked Chikato for an opportunity to review his personnel file to address what he believed to be lies in the file. (Doc. 49 at 9; Doc. 51 at 66-67; Doc. 58 at 17-18). Chikato stated in her affidavit that the holidays and the personnel file review process created a delay in scheduling a time for Plaintiff to review his file. (Doc. 49 at 9; Doc. 58 at 5-6). Before a time could be set, Plaintiff again emailed her expressing his lack of confidence in her ability to follow through. (Doc. 58 at 6, 20).

After the performance review and expectations memo, Plaintiff became very negative and began taking extended time off from work. (Doc. 56 at 6). Beginning January 2, 2013, Plaintiff told Scherrer that he could not be at work because he was caring for a sick child. (*Id.*; Doc. 49 at 9). Around January 14, 2013, Plaintiff requested a two to three week leave of absence, which

---

[19] This was the inquiry regarding the conference call confrontation between Hopbell and Plaintiff that Chikato felt was resolved.

[20] Plaintiff admitted that Bendik had left him several messages, but could not recall if he had declined to meet with her. (Doc. 51 at 71).

Scherrer stated he passed along to Hopbell. (Doc. 56 at 6, 25).   On January 18, 2013, Hopbell informed Plaintiff that, due to business needs, he could not be granted a leave of absence without some sort of documentation (such as a form showing medical necessity).[21] (Doc. 55 at 5, 20). Plaintiff did not provide such documentation and, on January 22, 2013, submitted his resignation, stating that he was unable to make things work no matter what he did. (Doc. 49 at 9; Doc. 56 at 26).

## III. Standard of Review

### A.  Summary Judgment

A party is entitled to summary judgment when it can show that there is no genuine issue of material fact. FED. R. CIV. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). The moving party bears the burden of showing that no genuine issues of material fact exist. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F.Supp. 2d 1347, 1352 (M.D. Fla. 2003).   A court "must draw all reasonable inferences in favor of the non-moving party, and it may not make credibility determinations or weigh the evidence." *Hinson v. Clinch County, Ga. Bd. Of Educ.*, 231 F.3d 821, 826-27 (11th Cir. 2000) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51, 120 S. Ct. 2097 (2000)).

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions,

---

[21] Plaintiff did mention in his resignation email that a physician had recommended he take time off from work. However, Plaintiff offered no evidence in support of this contention. (Doc. 52 at 12).

answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25, 106 S. Ct. 2548 (1986) (internal quotations and citation omitted).   Thereafter, summary judgment is mandated against the non-moving party who fails to make a showing sufficient to establish genuine issues of material fact for trial. *Id.* at 322, 324-25; *Watson*, 252 F.Supp. 2d at 1352.   The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value"); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

**III. Legal Analysis**

**A.  Hostile Work Environment**

Plaintiff claims he was subjected to a hostile work environment by Defendant in violation of Title VII of the Civil Rights Act of 1964.   A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).   The Supreme Court has noted that "[h]ostile environment claims are different in kind from discrete acts. Their very nature involves *repeated conduct*," and they are based on the "cumulative effect of individual acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) (emphasis added).   As such, in order to establish a hostile work environment, a plaintiff must show: (1) he belongs to a protected group; (2) he has been the subject of unwelcome harassment; (3) the harassment must have been based on a protected characteristic of the plaintiff;

(4) the harassment was sufficiently severe or pervasive as to alter the terms and conditions of employment and create an abusive working environment; and (5) the employer is responsible for that environment. *Miller*, 277 F.3d at 1275.

Moreover, the determination on the pervasiveness of the alleged harassment (element four) involves a subjective and objective component. *Id.* at 1276. Thus, to be actionable under this test, harassing behavior must result in "both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive.'" *Id.* (quoting *Harris*, 510 U.S. at 21-22). In evaluating the objective severity of the harassment, a court must consider several other factors including: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating; and (4) whether the conduct unreasonably interferes with the employee's job performance.

Plaintiff has failed to provide evidence supporting a Title VII hostile work environment claim. Since Defendant pointed out an absence of evidence on a dispositive issue, Plaintiff was required to go beyond the pleadings and establish through evidence that there were genuine issues of material fact for trial.[22] Plaintiff has failed to meet this burden regarding at least two of elements of the Title VII hostile work environment claim.

As for the first element, Plaintiff is a member of a protected group due to his Russian ancestry and his Jewish faith. Moreover, interpreting the evidence in the light most favorable to the Plaintiff, there is some evidence of Plaintiff suffering unwelcome harassment, which could satisfy the second element.[23] As for the third element, Plaintiff has presented no evidence to

---

[22] *See Celotex*, 477 U.S. at 324-25.

[23] This unwelcome harassment comes from the comment made by Wood and the telephone

- 12 -

suggest in any way that the alleged harassment from Hopbell was based on his protected status.[24] In fact, Plaintiff himself admitted in his deposition that he could not recall Hopbell ever making a comment about his Jewish faith and he only assumed the treatment from Hopbell was due to his protected status because he could think of no other explanation. As for the comment from Wood, the Court will assume, *arguendo*, that it was made because of his Russian ancestry.[25] Therefore, there is some evidence of a genuine issue of material fact relating to the third element.

However, Plaintiff has failed to provide any evidence supporting the final two elements. First, Plaintiff has failed to demonstrate that the harassment was pervasive.[26] Here, the conduct at issue boils down to a single comment from Wood to the Plaintiff.[27] Assuming, *arguendo*, that the harassment satisfied the subjective test for pervasiveness, it falls far short of satisfying the objective test.[28] When looking at the four factors that comprise the objective test, Plaintiff has

---

altercation with Hopbell.

[24] In fact, Plaintiff alleges that the hostile work environment was created through Hopbell wanting to "manage him out" and giving him an expectations memo. (Doc. 49 at 10). However, Plaintiff never links either of these things to his protected status.

[25] It is important to note, though, that one passing comment is not nearly enough to qualify as harassment.

[26] The Supreme Court has been clear that the conduct must be pervasive and "extreme to amount to a change in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).

[27] Plaintiff's passing deposition references to Wood making comments to others in the workplace, without more, are not relevant to this case. Also, the interactions with Hopbell that Plaintiff characterized as harassment can't be considered as such since they were nothing more than workplace disagreements. *See Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1234 (11th Cir. 2006) ("Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the working place.") (internal quotations omitted).

[28] Even the assumption that the subjective test is satisfied is a stretch since Plaintiff admitted he believed the comment from Wood was a harmless joke at the time it was made.

failed to provide evidence that would meet any of them. First, since the alleged harassment boils down to a single comment, it was infrequent at best. Second, the conduct was not severe, as evidenced by Plaintiff's belief that the comment was a joke.[29] Third, Plaintiff has provided no evidence that the comment was made in a physically threatening manner or that it humiliated him. Fourth, there is likewise no evidence that the comment from Wood, or any other comments, in any way interfered with Plaintiff's ability to carry out his duties.

Second, there is no evidence tending to show that Defendant in any way condoned, knew about, or encouraged this alleged harassment and hostile work environment.[30] As such, there is no genuine issue of material fact as to the fifth element.

In addition to there being no evidence regarding two dispositive elements of the claim, Plaintiff's claim is also barred because he failed to report it. Generally, an employer can be held vicariously liable for a hostile work environment created by a supervisor in the victimized employee's chain of command.[31] However, in *Faragher*, the Supreme Court laid out a defense to this type of liability. In that case, the Court said an employer has an affirmative defense to vicarious liability when two conditions are met: (1) "the employer exercised reasonable care to

---

[29] *See Faragher*, 524 U.S. at 778 ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of the employment.").

[30] Since Wood was not in the Plaintiff's chain of command, Plaintiff would need to provide evidence showing the employer knew or should have known of the harassing conduct and failed to take remedial action in order to satisfy this element. Plaintiff has provided no such evidence. *See Miller,* 277 F.3d at 1278 ("Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action.").

[31] Plaintiff states that Wood was in a position of authority in the same office as him, though not in his chain of command. As to the affirmative defense, the Court will assume, *arguendo*, that Wood was in a position of authority in relation to the Plaintiff.

prevent and correct promptly any . . . harassing behavior; and (2) the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807.

As for the first element, Defendant has a published policy regarding this type of harassment and it requires employees to immediately report any harassment based on national origin or religion. This type of policy is enough to satisfy the first element of the defense. *See Id.* The second element is also satisfied because Plaintiff never reported any instance of harassment based on his national origin or religion. In fact, the first time Plaintiff mentions that the harassment must be due to his protected characteristics is in this lawsuit. Thus, he has failed to take advantage of the measures instituted by his employer to prevent this type of behavior. *See Id.* at 807-08 ("A demonstration of [failure to use any complaint procedure[s] provided by the employer] will normally suffice to satisfy the employer's burden under the second element of the defense.").

In sum, the burden for establishing a hostile work environment is high,[32] and Plaintiff has failed to show that there is any evidence supporting two dispositive elements of the hostile work environment claim. Moreover, Plaintiff has failed to present evidence rebutting the affirmative defense raised by the Defendant. Accordingly, Defendant is entitled to summary judgment on Plaintiff's hostile work environment claim (Count I).[33]

---

[32] *See, e.g.*, *Barrow v. Georgia Pacific Corp.*, 144 Fed. App'x 54, 57-58 (11th Cir. 2005) (holding that a workplace rife with racial symbols and racial slurs was not enough to establish a hostile work environment); *Thompson v. City of Miami Beach, Fla.*, 990 F.Supp. 2d 1335, 1341 (S.D. Fla. 2014) (holding that a series of severe racial slurs directed at the employee were not pervasive enough to establish a hostile work environment).

[33] Plaintiff has likewise failed to establish a constructive discharge. To prove a constructive discharge, Plaintiff must "demonstrate a greater severity or pervasiveness of harassment than the minimum required to prove a hostile working environment." *Hipp v. Liberty Nat. Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001) (quoting *Landgraf v. USI Film Prods.*, 968 F.2d 427, 430

**B. Failure to Promote**

Plaintiff claims Defendant discriminatorily failed to promote him in violation of Title VII of the Civil Rights Act of 1964.  A failure to promote is a discrete act which requires a claim to be brought within a certain period of time. *National R.R. Passenger Corp.*, 536 U.S. at 114 ("Discrete discriminatory acts are not actionable if time barred. . . .").  For a failure to promote claim, that period of time is 300 days. 42 U.S.C. § 2000e-5(e)(1); *Johnson v. City of Tampa*, 2013 WL 1912790, at *8 (M.D. Fla. May 9, 2013).  The failure to promote at issue here occurred in the fall of 2011.  This claim was filed in the fall of 2013.  Since nearly two years elapsed between the failure to promote and the claim being brought, this claim is time barred.  Accordingly, Defendant is entitled to summary judgment on Plaintiff's failure to promote claim (Count III).

**C. Disparate Treatment**

Plaintiff claims Defendant subjected him to disparate treatment based on his race in violation of 42. U.S.C. § 1981.  While the second amended Complaint is not entirely clear as to which conduct Plaintiff is alleging falls under this statutory provision, Plaintiff's response to Defendant's motion for summary judgement focuses on a failure to hire claim under § 1981.[34]  In order to establish a *prima facie* case of a violation of § 1981 for failure to promote based on circumstantial evidence, a plaintiff must show that: "(1) he 'is a member of a protected class;' (2) he 'was qualified and applied for the position;' (3) he 'was rejected despite [his] qualifications;' and (4) another equally or less qualified employee who was not a member of the protected class

---

(5th Cir. 1992)). Since Plaintiff cannot prove a hostile work environment existed, he cannot prove a constructive discharge occurred. *Barrow*, 144 Fed. App'x at 59.  Defendant is therefore entitled to summary judgment on Plaintiff's constructive discharge claim (Count II).

[34] Presumably, this stems from the Plaintiff's failure to be selected for the promotion for which he applied.

was promoted." *Nance v. Ricoh Electronics, Inc.*, 381 Fed. App'x 919, 921 (11th Cir. 2010) (quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1089 (11th Cir. 2004)).

If the plaintiff succeeds in establishing a *prima facie* case, courts will employ the burden shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this framework, once the *prima facie* case is established, a presumption of discrimination is created against the employer. *Wilson*, 376 F.3d at 1087.  After this, the burden of production shifts to the employer to "articulate a legitimate, nondiscriminatory reason for its actions." *Id.* (quoting *Texas Dep't of Community Aff. v. Burdine*, 450 U.S. 248, 255-56 (1981)).  If the defendant employer satisfies its burden by articulating one or more legitimate reasons for its actions, the burden of production shifts back to the plaintiff to "offer evidence that the alleged reasons of the employer are a pretext for illegal discrimination." *Id.*

Here, Plaintiff has failed to provide any evidence regarding Scherrer's qualification for the position.  But, even if Plaintiff had established a *prima facie* case of discriminatory failure to promote, Defendant has met its burden of production. Defendant has produced a declaration from Hall, the person who made the ultimate hiring decision on the position for which Plaintiff applied.[35]  Hall detailed in his declaration the interview process and why he felt Scherrer was a better candidate for the job than Plaintiff.  Plaintiff has produced no evidence whatsoever to contradict the assertions by Hall.[36]  Nor has Plaintiff produced any evidence that the reasons

---

[35] It is worth noting that Hall has not been accused of any discriminatory or hostile conduct by the Plaintiff.

[36] Mere disagreement with business decisions the Defendant has made is not enough to show pretext. *See Rowell v. Bellsouth Corp.*, 433 F.3d 794 (11th Cir. 2005) ("[I]t is now axiomatic that we cannot second-guess the business decisions of an employer.").

given by Hall were pretextual. Defendant is therefore entitled to summary judgment on Plaintiff's disparate treatment claim (Count IV).

**IV. Conclusion**

It is not the province of the federal judiciary to solve workplace disputes or provide relief for employees who disagree with the decisions of their superiors.   Defendant has shown that there are no genuine issues of material fact relating to dispositive elements of each of the Plaintiff's claims.

For the foregoing reasons, Defendant Walt Disney World Parks and Resorts Online, Inc.'s Motion for Summary Judgment (Doc. 49) is **GRANTED**.   The Clerk of the Court is directed to enter a judgment in favor of the Defendant and against the Plaintiff on all claims in the Complaint. The Court reserves jurisdiction to assess costs.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on June 20, 2016.



GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party